IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 79267-9-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| RONELLE ASHTON WILLIAMS, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

HAZELRIGG, J. — Ronelle A. Williams was found guilty after a jury trial of assault in the second degree, felony harassment, unlawful possession of a firearm in the first degree, assault in the fourth degree, and witness tampering. Firearm and domestic violence enhancements applied to a number of the charges, and the jury found by special verdict that Williams knew the victim was pregnant at the time of the assault. The victim did not testify at trial, but a number of her statements were admitted under certain hearsay exceptions. Williams appeals, arguing his arrest was not supported by probable cause, that numerous deficiencies and evidentiary issues, including sufficiency, deprived him of a fair trial and, in a statement of additional grounds, that he received ineffective assistance of counsel based on instructional error and that his offender score was miscalculated. We affirm.

Citations and pinpoint citations are based on the Westlaw online version of the cited material.

FACTS

On November 4, 2017, Sametra Beck ran to a neighbor's apartment to call 911, reporting that her boyfriend had assaulted her and threatened her with a firearm. In the call, Beck identified her boyfriend as Ronald Ruffin. Beck told the 911 operator that the incident occurred when Ruffin had come home from a night out and found her daughter's father at the apartment to pick up the child. Beck reported Ruffin smelled like alcohol and hit her in the face, then held a gun to Beck's stomach and threatened to kill her unborn child.

Des Moines Police Officer Shawn O'Flaherty quickly arrived on the scene and other officers soon joined him. Beck ran out of the neighbor's apartment and retold the events to O'Flaherty while seated in the back of a patrol vehicle near the apartments. The officer described Beck as hysterical and hyperventilating as she attempted to convey what had transpired. O'Flaherty radioed that there was probable cause to make an arrest. Beck informed the officers that she believed Ruffin to still be in her apartment because she observed his car in the parking lot. Sergeant Anthony Nowacki moved his vehicle in front of Beck's apartment and utilized his public address (PA) system to direct Ruffin to come outside with his hands up. No one emerged. Simultaneously, Officer Robert Tschida was watching the back of the four-plex apartment building.

Tschida observed a man later identified as Ronelle Williams behind apartment #2, which was Beck's. Williams started walking toward the back fence. Tschida ordered him to stop, however Williams did not acknowledge Tschida and continued walking toward the gated exit. The officers then took Williams into

custody. Williams declined to identify himself to police and did not make any statements pursuant to arrest. Officers did not take Williams to Beck for identification while on scene, nor did they arrange for any other manner for her to identify Williams as her attacker prior to trial.

While in custody, Williams made multiple jail phone calls, one of which was the basis for the witness tampering charge. Beck did not appear at trial to testify, though she had intermittent contact with the prosecutor during the pendency of the case and participated in a defense interview. A jury convicted Williams of assault in the second degree, felony harassment, unlawful possession of a firearm in the first degree, assault in the fourth, and witness tampering. The jury found by special verdict that the assaults, harassment, and witness tampering were domestic violence offenses, and that a firearm enhancement applied to the felony assault and harassment counts. It further found an additional aggravating factor as to the assault in the second degree based on Williams's knowledge that Beck was pregnant at the time of the assault. At sentencing, the State moved to dismiss the felony harassment on double jeopardy grounds, which was granted. Williams was scored as a 9+[1] for purposes of sentencing based on his criminal history and was sentenced to 120 months in prison. Williams timely appealed.

---

[1] Under the Sentencing Reform Act (SRA), base sentencing ranges do not extend beyond an offender score of nine. RCW 9.94A.510. While courts are required to determine the precise offender score of each defendant, an offender score higher than nine is referenced in the SRA sentencing manual and scoring sheets as 9+.

ANALYSIS

I.     Probable Cause to Arrest

Both the United States and Washington constitutions require arrests to be supported by probable cause. State v. Graham, 130 Wn.2d 711, 724, 927 P.2d 227 (1996). For probable cause to exist for an arrest, an officer must have "knowledge of facts sufficient to cause a reasonable person to believe that an offense has been committed." State v. Potter, 156 Wn.2d 835, 840, 132 P.3d 1089 (2006). Further, probable cause must be individualized to the person being arrested. State v. Grande, 164 Wn.2d 135, 142-43, 187 P.3d 248 (2008). "The determination [of probable cause to arrest] will rest on the totality of facts and circumstances within the officer's knowledge at the time of the arrest." State v. Fricks, 91 Wn.2d 391, 398, 588 P.2d 1328 (1979) (alterations in original).

Here, the trial court held a hearing under CrR 3.6 on Williams's motion to suppress based on his claim that his arrest was unsupported by probable cause. On appeal, he challenges three of the findings of fact entered by the trial court, without expressly assigning error to them. The first of those findings is, "Beck gave a rather detailed description of her alleged assailant, described as black male, 32, 5'10", medium build, bald, and sporting a goatee." The other two challenged findings of fact focus on essentially the same thing: "Officer Tschida observed an individual, later identified as the defendant, matching the exact description given by Beck materialized outside of the back of apartment #2" and "[t]he individual observed exactly matched the physical description given by Beck." We review the trial court's findings of fact for substantial evidence. State v. Stewart, 12 Wn. App.

236, 240, 457 P.3d 1213 (2020). "Substantial evidence exists where there is a sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the finding." State v. Hill, 123 Wn.2d 641, 644, 870 P.2d 313 (1994).

Williams's briefing focuses on the descriptors used by the trial court in those three findings: "a rather detailed description," "matching the exact description," and "exactly matched." This argument is splitting semantic hairs; the crux of each of these findings is supported by substantial evidence. If we were to consider the findings without the adjectives and adverb, which serve as a cautionary reminder to trial courts about precision in written findings, our analysis as to probable cause would not substantively change. All other findings are unchallenged and therefore considered verities on appeal. State v. Acrey, 148 Wn.2d 738, 745, 64 P.3d 594 (2003). This court reviews de novo the trial court's conclusions that there was probable cause to arrest. State v. Chamberlin, 161 Wn.2d 30, 40-41, 162 P.3d 389 (2007). Williams concedes, as he did in the trial court, that police had probable cause to arrest a suspect for the crimes Beck alleged. However, he avers that the police did not have probable cause to arrest him, based on his assertion that the description given by Beck was insufficient and that no one saw him exit Beck's apartment.

The findings by the trial court provide that Beck had called 911 "describ[ing] that she had been beaten up by her boyfriend and that he had pointed a handgun at her stomach." Beck "identified the suspect as Ronald Ruffin and described him as a black male, 32 years old, approximately 5'10", medium build, bald, and with

a small goatee." Police arrived on the scene "within about 5 minutes," Beck then ran out of apartment #1 and again provided the same description of the suspect. Tschida was directed by Nowacki to station himself by the southeast corner of the apartment complex. Nowacki used a PA system to "entice the suspect out of apartment #2." "Officer Tschida observed an individual, later identified as the defendant . . . materialize outside of the back of apartment #2." Tschida acknowledged that "he did not see the door open but that the individual did leave the back of ap[artmen]t #2." The individual then "walked away from the apartment but then turned around and headed to the gate in the fence which was near the front of the apartment" with Tschida observing the individual "for approximately 15-20 seconds." At this point, "Tschida yelled to the individual that he was under arrest and told him to get on the ground." The "individual opened the gate in the yard and was greeted by Sergeant Nowacki and Officer O'Flaherty." The individual was then arrested and later identified as Ronelle Williams.

"Probable cause derives from a composite of facts, circumstances and judgment." State v. Parker, 79 Wn.2d 326, 328, 485 P.2d 60 (1971). At the CrR 3.6 hearing, Williams acknowledged that there was reasonable suspicion based on the observations to stop him. However, he argues that the gaps in the officers' observations once they arrived on the scene made it necessary to affirmatively identify the individual they saw appear from the apartment in order to establish probable cause. The trial court was unpersuaded by this argument and we are similarly unmoved.

Under the totality of circumstances, the officers had sufficient probable cause to arrest Williams as he appeared to exit from the location where the suspect was said to be located and he matched the description provided by Beck. Further, there were numerous officers on the scene and the PA system was utilized to call for an individual to come out with his hands up. Shortly thereafter, an individual who matched the description given by Beck appeared outside the back of the apartment where the assault occurred and refused to stop when addressed by Tschida. That individual was eventually identified as Williams. The trial court properly found that there was individualized probable cause to arrest Williams.

II.    Jury Selection

The federal and state constitutions both guarantee trial by an impartial jury in all criminal prosecutions. U.S. CONST. amend. VI, XIV; WASH. CONST. art. I, §§ 3, 21, 22; State v. Davis, 141 Wn.2d 798, 824, 10 P.3d 977 (2000). Williams alleges that errors or irregularities occurred with two potential jurors during voir dire that violated certain trial rights and ran afoul of the Equal Protection Clause.

A.  Juror 22's Comments During Voir Dire

Williams frames this assignment of error as a trial irregularity which he avers prejudiced the jury pool such that it deprived him of a fair trial. The conduct that Williams argues warranted a mistrial was a comment by Juror 22 in which the juror invoked his prior experience as an Internal Revenue Service officer. The statement was a deep expression of broad skepticism as to the presumption of innocence in criminal cases. Juror 22 was excused for cause after the court

inquired further regarding this belief. Williams moved for a mistrial the next day, but the motion was denied. The court reiterated that it would be instructing the jurors as to the proper burden for the case.

This court reviews a trial court's ruling on a motion for a mistrial for abuse of discretion. State v. Escalona, 49 Wn. App. 251, 254-55, 742 P.2d 190 (1987). "A mistrial should be granted when the defendant has been so prejudiced that nothing short of a new trial can insure that the defendant will be tried fairly." State v. Gamble, 168 Wn.2d 161, 177, 225 P.3d 973 (2010). On appeal, we will only overturn the trial court's denial of a motion for mistrial where there is a substantial likelihood that the prejudice affected the verdict. Id.

Williams advocates for use of the three-factor test developed in State v. Escalona and State v. Weber. Escalona, 49 Wn. App. at 254-55 (citing Weber, 99 Wn.2d 158, 164-66, 659 P.2d 1102 (1983)). However, that test is clearly not fit for a context such as this one where the challenged conduct is alleged to have occurred during voir dire. Our conclusion on this preliminary matter is based on the second factor of the Escalona/Weber test: "whether the statement in question was cumulative of other evidence properly admitted." Id. at 254. This question is generally inapplicable on review of an alleged error during voir dire as presentation of evidence would not have begun at that point in the proceedings. Further, Williams provides no authority for the use of this test on a motion for a mistrial during voir dire. As such, we find it is not the proper framework for our inquiry.

"Where the selection process is in substantial compliance with the statutes, the defendant must show prejudice. If there has been a material departure from

the statutes, prejudice will be presumed." State v. Tingdale, 117 Wn.2d 595, 600, 817 P.2d 850 (1991). Here, Williams does not argue the trial court departed from its compliance with statutory requirements for the jury selection process. Williams's concern lies with statements regarding the presumption of innocence by a prospective juror. However, Williams does not provide us with any tangible ground for a finding of prejudice flowing from Juror 22's comments, much less that those comments affected the verdict. This is particularly so in light of the fact that the court properly instructed the jury as to the law, and the presumption that the jurors follow such instruction. State v. Sullivan, 3 Wn. App. 2d 376, 380, 415 P.3d 1261 (2018). The trial court is in the best position to rule on the motion for a mistrial based on conduct during voir dire due to its ability to properly evaluate the context at-large and more comprehensively assess whether the conduct or issue in question prejudiced the defendant's right to a fair trial. See State v. Sullivan, 196 Wn. App. 277, 288, 383 P.3d 574 (2016). Absent a showing of prejudice, we will not disturb the trial court's denial of the motion for a mistrial; we find no abuse of discretion.

## B.  Juror 14's Hardship Challenge and Dismissal For Cause

Williams raised a two-fold, and somewhat contradictory, challenge to the court's rulings as to Juror 14. He first attacks the trial court's decision not to dismiss the potential juror based on hardship and then argues he was later improperly excused for cause. There exists an odd, and ultimately dispositive, tension with Williams's argument as to this issue.

The for cause portion of Williams's argument focuses on the State's challenge to Juror 14 based on his stated inability to be fair and unbiased. Article I, section 22 of the Washington constitution and the Sixth Amendment of the federal constitution guarantee every criminal defendant the right to a fair and impartial jury. The grant or denial of a challenge for cause is within the discretion of the trial court. State v. Witherspoon, 82 Wn. App. 634, 637, 919 P.2d 99 (1996). There are three types of for cause challenges. RCW 4.44.170. Here, the concern was bias based on:

> [T]he existence of a state of mind on the part of the juror in reference to the action, or to either party, which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging, and which is known in this code as actual bias.

RCW 4.44.170(2). The trial court is in the best position to evaluate a juror's ability to be fair and impartial based on demeanor and interpretation of the juror's responses. State v. Noltie, 116 Wn.2d 831, 839, 809 P.2d 190 (1991).

The trial court did not abuse its discretion in granting the for cause challenge by the State. During voir dire, Juror 14 made numerous remarks to indicate he was skeptical of his ability to fulfill the duties of a juror. Examples near the end of voir dire include the following exchange between Juror 14 and the prosecutor: "anybody [feel] like they're pretty uncomfortable, that they would be pretty uncomfortable sitting on this jury at this point?" Juror 14 responded yes, because "[a]gain, just not fitting in. Just like the judicial system has a lot of flaws and this might be one of them because you put so many people in a room to crucify somebody or say they're innocent." Juror 14 elaborated on this response by

stating, "I dealt with cases myself. I feel like I've been taken advantage of, you know, all the legal jargon. You don't get, you can't afford a public defender, you meet 10 days before your trial." When asked by the State, "if you were picked to sit for this jury, you'd have no problem listening to the evidence and kind of rendering a verdict?" Juror 14 responded, "[y]eah, I couldn't tell you. I don't know. It just depends on the case."

Juror 14 then expressed doubt about who is credible and suggested that the court was solely responsible for credibility determinations. The prosecutor responded by explaining that credibility determinations are within the province of the jury. Prior to this, Juror 14 had also indicated he could not be fair based on the case involving alcohol and, more broadly, that he didn't "believe in the judicial system. It's biased itself." The final indicator that reinforced the determination that Juror 14 may have actual bias occurred when the prosecutor asked the entire pool if they felt confident in their ability to examine and weigh all the evidence, all members, except Juror 14, answered affirmatively. In light of this record, we find no abuse of discretion in the dismissal of Juror 14 for cause.

Despite our conclusion that the for cause dismissal of Juror 14 was proper, we cannot overlook the troubling statements and reasoning offered by the court in response to that same juror's request for hardship dismissal earlier in voir dire. RCW 2.36.100(1) provides the trial court with "'broad discretion' to excuse prospective jurors 'upon a showing of undue hardship, extreme inconvenience, public necessity, or any reason deemed sufficient by the court.'" State v. Wilson,

174 Wn. App. 328, 344, 298 P.3d 148 (2013) (quoting State v. Rice, 120 Wn.2d 549, 560-62, 844 P.2d 416 (1993); RCW 2.36.100(1)) (emphasis omitted).

Prior to striking Juror 14 for cause, the court declined to grant his dismissal based on hardship because he was perceived to be a person of color. The court specifically stated "He's a person of color. Is that correct, 14? I would prefer to keep him." Juror 14's hardship was based on financial concerns and being the "sole breadwinner." However, the court refused the hardship stating, "I mean, ordinarily, we would excuse. I hate to—why don't we keep him for further questioning."

Williams raises an equal protection challenge to the denial of Juror 14's hardship dismissal. "Purposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure." Batson v. Ky., 476 U.S. 79, 86, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). A defendant has standing to bring an equal protection claim on behalf of a juror, "because racial discrimination in the selection of jurors 'casts doubt on the integrity of the judicial process,' . . . and places the fairness of a criminal proceeding in doubt." Powers v. Ohio, 499 U.S. 400, 411, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991) (quoting Rose v. Mitchell, 443 U.S. 545, 556, 99 S. Ct. 2993, 3000, 61 L. Ed. 2d 739 (1979)). The burden is on the defendant who argues discrimination occurred during voir dire "'to prove the existence of purposeful discrimination.'" Batson, 476 U.S. at 93 (quoting Whitus v. Ga., 385 U.S. 545, 550, 87 S. Ct. 643, 17 L. Ed. 2d 599 (1967)).

At oral argument on appeal, the prosecutor conceded that Juror 14 was held to a different hardship standard based on the court's perception of his race, but added that this differential standard is not a form of discrimination legally or even by lay definition. This argument is not well taken. It is exceedingly clear from the record that discrimination did occur as to the court's consideration of Juror 14's proffered hardship; the court effectively stated that if that same reason were offered by a white juror "we would excuse." Williams centers most of his argument on this issue in GR 37 and Batson v. Kentucky, which are expressly aimed at peremptory challenges, in part because the record demonstrates that was the analysis used by the court. 476 U.S. 79.

We decline to so frame our analysis. However, we do find that the wisdom and concerns expressed in the broader body of case law on nondiscriminatory jury selection must be reinforced given the conduct of the attorneys and trial court with regard to the hardship standard for Juror 14, and the State's misguided argument on appeal. "A person's race simply 'is unrelated to his fitness as a juror.'" Batson, 476 U.S. at 87 (quoting Thiel v. S. Pac. Co., 328 U.S. 217, 223-24, 66 S. Ct. 984, 987-88, 90 L. Ed. 1181 (1946) (Frankfurter, J., dissenting)). Further, "[t]he harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community." Id. This statement rings true in this context, as here there is grave risk of harm to our community when a particular race of jurors are held to a higher hardship standard than others.

The State suggested at oral argument that we should not take up this issue because an equal protection claim based on jury selection can only arise from the

juror's exclusion from jury service based on race; that no such claim could stand on a juror's inclusion after a race-based denial of their hardship request. This assertion flies in the face of decades of equal protection case law. Equal protection analysis centers on disparate treatment based on an immutable characteristic. See U.S. v. Va., 518 U.S. 515, 116 S. Ct 2264, 135, L. Ed. 2d 735 (1996); Craig v. Boren, 429 U.S. 190, 97 S. Ct. 451, 50 L. Ed. 2d 397 (1976); Fisher v. Uni. of Tex. at Austin, 136 S. Ct. 2198, 195 L. Ed. 2d 511, (2016); Castaneda v. Partida, 430 U.S. 482, 97 S. Ct. 1272, 51 L. Ed. 2d 498 (1977). Tellingly, the State could not offer any authority in support of its position when questioned by this panel.

On the record before us, we find the trial court abused its discretion as to the denial of Juror 14's hardship dismissal as it engaged in improper analysis and the prejudice is clear. This sort of discriminatory justification has no place in the jury selection process, not even under the broad statutory language "any [other] reason deemed sufficient by the court." RCW 2.36.100(1). While we recognize the laudable intention of the trial court to have a more diverse jury that more closely reflects the community at large, as officers of the court we must be cognizant of the methods we employ toward achieving this goal. We must educate ourselves, we must listen, and we must proceed with clear intention to avoid further harm. Race, nor any other immutable characteristic of identity, must not be used to hold jurors to differential standards. However, in providing this guidance we acknowledge that we are constrained by the fact that Juror 14 was ultimately excused for cause. As such, it would appear that Juror 14 may not have suffered the economic hardship which he believed would ensue had he been seated.

Further, there is nothing in the record to suggest that similar reasoning was used by the attorneys or judge in the dismissal, or inclusion, of any other jurors. Because Juror 14 was excused for cause after the judge found evidence of actual bias, we find the error by the court did not affect the outcome of Williams's trial.

III.     Evidentiary Rulings on Hearsay Challenges

Williams next assigns error to two separate evidentiary rulings by the trial court related to hearsay exceptions.  Hearsay is an out-of-court statement "offered in evidence to prove the truth of the matter asserted."  ER 801(c).  A written or oral statement may constitute hearsay.  ER 801(a).  Hearsay is inadmissible unless it falls under a recognized exception to the hearsay rule.  ER 802.  "In instances of multiple hearsay, each level of hearsay must be independently admissible."  State v. Hopkins, 134 Wn. App. 780, 788, 142 P.3d 1104 (2006); See also ER 805.  The offered evidence must also meet relevance requirements under ER 401 and 402.

A.  Business Record Exception to Hearsay

Williams renews his argument from the trial court that the business records exception to hearsay does not apply to his jail booking sheet and, as such, it was improperly admitted.  Williams's focus is on the "also known as" (a/k/a) information contained within the booking sheet, Ronald Ruffin.  He avers that it was improper to admit that information when no one could establish where, when, or specifically how this alias was generated.  The booking sheet was the strongest evidentiary link between Williams and the Ruffin alias and its admissibility was directly litigated,

with the trial court at one point considering redaction of the a/k/a information as a condition of its admission.

"The Uniform Business Records as Evidence Act (UBRA), ch. 5.45 RCW, makes evidence that would otherwise be hearsay competent testimony." State v. Fleming, 155 Wn. App. 489, 499, 228 P.3d 804 (2010).

> To be admissible under the business records exception, (1) the business record must be in record form; (2) be of an act, condition, or event; (3) be made in the regular course of business; (4) be made at or near the time of the fact, condition, or event; and (5) the court must be satisfied that the sources of information, method, and time of preparation justify admitting the evidence.

Id. Under UBRA, business records are presumed to be reliable if made in the regular course of business and there is no apparent motive to falsify. Id. "While the UBRA is a statutory exception to hearsay rules, it does not create an exception for the foundational requirements of identification and authentication." State v. Devries, 149 Wn.2d 842, 847, 72 P.3d 748 (2003). The State introduced testimony from Sergeant Jennifer Schneider to identify and generally authenticate the booking sheet. However, she further explained that there were multiple possible sources for alias information on a booking sheet and she did not have knowledge as to the source of the Ruffin alias specifically.

The record leads us to conclude that any error which may have occurred as to the admission of the a/k/a is rendered harmless in light of the unchallenged evidence admitted at trial. "Error is harmless if it did not prejudice a substantial right of [Williams] and we can say beyond a reasonable doubt that it in no way affected the outcome of the case." State v. Hines, 87 Wn. App. 98, 102, 941 P.2d 9 (1997). Images of two Washington identification cards each with photos of a

man who appears to be the same person, one in the name of Ronelle Williams and the other Ronald Ruffin, were admitted at trial and the man in those photos also appears to match Williams's jail booking photo contained in the challenged document. The jury would be able to review those exhibits and compare them to Williams as he appeared seated with the defense during trial. Despite a defense based in part on Williams's rejection of the Ruffin identity, the jail calls that were admitted contain Williams's acknowledgement of his involvement in some sort of incident which was prompted by the father of Beck's daughter arriving at the location where Williams was arrested. Those facts are consistent with the 911 call that was also admitted as evidence wherein Beck identified her assailant as Ruffin. Even if we were to find the admission of the booking sheet was improper under the business record exception to hearsay, the error would be harmless in light of the other evidence admitted at trial.

B. Hearsay and the Right to Confrontation

Williams next argues that the court improperly admitted Beck's statements to O'Flaherty because the statements were testimonial in nature, and thus violated his right to confrontation. Beck's 911 call, which the trial court determined was non-testimonial and admitted at trial, is not at issue on appeal. After a hearing on the admissibility of Beck's statements, the trial court determined that those made to O'Flaherty and in the 911 call were excited utterances and therefore admissible as exceptions to the general prohibition against hearsay.

In all criminal prosecutions, the accused has the right to confront the witnesses against them. US CONST. amend VI; WASH. CONST. art. I, § 22. The

right to confrontation prevents testimonial statements by a witness who does not testify, unless the witness is determined to be unavailable and the defendant had a prior opportunity to cross examine the witness. Davis v. Wash., 547 U.S. 813, 821, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006); Crawford v. Wash., 541 U.S. 36, 53-54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). "An alleged violation of the confrontation clause is reviewed de novo." State v. Jasper, 174 Wn.2d 96, 108, 271 P.3d 876 (2012). Davis v. Washington established the primary purpose test to determine if statements are testimonial in nature by holding:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. at 822. The Washington Supreme Court in State v. Koslowski acknowledged the four-part fact test established in Davis was the proper analysis. 166 Wn.2d 409, 418-19, 209 P.3d 479 (2009).

> (1) Was the speaker speaking about current events as they were actually occurring, requiring police assistance, or was he or she describing past events? The amount of time that has elapsed (if any) is relevant. (2) Would a "reasonable listener" conclude that the speaker was facing an ongoing emergency that required help? A plain call for help against a bona fide physical threat is a clear example where a reasonable listener would recognize that the speaker was facing such an emergency. (3) What was the nature of what was asked and answered? Do the questions and answers show, when viewed objectively, that the elicited statements were necessary to resolve the present emergency or do they show, instead, what had happened in the past? For example, a 911 operator's effort to establish the identity of an assailant's name so that officers might know whether they would be encountering a violent felon would indicate the elicited statements were

nontestimonial. (4) What was the level of formality of the interrogation? The greater the formality, the more likely the statement was testimonial. For example, was the caller frantic and in an environment that was not tranquil or safe?

Id.

Here, the findings of fact on the question of hearsay and right to confrontation are not challenged by Williams and therefore are verities on appeal. Acrey, 148 Wn.2d at 745. In applying the four factors, we agree that Beck's statements to the officer were non-testimonial in nature and made in order to assist police with an ongoing emergency. As to the first factor, whether Beck was discussing current events as they were occurring that required police assistance or speaking about past events, Beck's statements were a mix of current events and events occurring in the immediate past. O'Flaherty was the first to arrive on the scene, within about five minutes of the 911 call. Beck ran out of her neighbor's apartment barefoot and was hysterical when approaching O'Flaherty.

O'Flaherty testified he gave "her a couple minutes to calm down" while in the back of his police car, as Beck was trying to speak but was hyperventilating. He stated that he asked Beck what happened and recounted her response as follows:

> She told me that her daughter had, she had a different daughter by a different father. And he had arrived to pick her up for a visitation about the same time that the defendant had arrived home. And she went out with the child. And then when she came back inside, the defendant, she basically said good morning to him, and the defendant punched her in the face instead of answering her. Then he continued to punch her. She said—and called her a whore. And she was trying to explain why, that the other father was just there to pick up the daughter. And then the defendant went upstairs and then came back downstairs. She meanwhile had gone outside, or he went outside to speak with the other father briefly, but she didn't know what he was talking about. Then she went outside to bring her

- 19 -

daughter some shoes. And when she came back inside, he grabbed her by the hair and threw her to the ground. And she actually had bruising and stuff to her face and her hair was loose like somebody had pulled it. And when he pointed the gun at her, she was actually, she sat down in a chair and he approached her. And he said that he pointed a handgun directly at her stomach and said he was going to kill the baby. And the muzzle of the gun was touching her stomach when he did this. More importantly, she also said she, you know, her demeanor, she believed it was going to happen. She said she was very fearful. Obviously by the way my first contact was with her. Then she complained of assault from the, or pain from the assault and still saw his car in the parking lot.

The majority of these statements were Beck's recitation of recent events that were not ongoing. It is relevant, though, that little time had passed since the events Beck described, as the police arrived within a few minutes of her call placed quickly after the incident occurred.

The second factor, whether a reasonable listener would conclude the speaker was facing an ongoing emergency that required help, weighs in favor of a determination that the statements were non-testimonial. Beck called for help immediately; at the time she was still located essentially at the scene, just outside of her apartment where the incident had occurred, and the precise whereabouts of her assailant, who was believed to be armed, were unknown. Further, it is relevant that the accused's vehicle was still on the scene which would indicate he was nearby.

As to the third factor, the nature of the officer's questioning, O'Flaherty testified he asked very few, if any, follow up questions of Beck. Essentially he arrived on the scene and asked Beck what happened. She provided the response set out above. This factor supports the conclusion that the statements were non-testimonial. The fourth factor, the level of the formality of the interrogation, also

tends to support that the statements were non-testimonial. The trial court found "Beck was barefoot, without a jacket, and exposed to the elements" and "O'Flaherty placed [] Beck in the back of his patrol car." Beck was placed in the car, not because she was a suspect subject to interrogation, but because O'Flaherty was aware that the suspect could be armed and his whereabouts were yet unknown. The car was parked in front of Beck's home. This factor suggests a less formal setting. In light of the four factors, we affirm the trial court's conclusion that Beck's statements to O'Flaherty were non-testimonial in nature and therefore admissible.

IV.  Denial of Defense CrR 8.3 Motion to Dismiss

Williams next avers that the court erred in failing to dismiss the case under CrR 8.3. He brought the motion based on government misconduct relating to the State's request to fingerprint Williams in the midst of trial as a means of connecting him to the Ruffin alias.

"Dismissal under CrR 8.3(b) requires a showing of arbitrary action or governmental misconduct, but the governmental misconduct need not be of an evil or dishonest nature, simple mismanagement is enough." State v. Brooks, 149 Wn. App. 373, 384, 203 P.3d 397 (2009). "The party seeking relief bears the burden to show misconduct by a preponderance of the evidence." State v. Salgado-Mendoza, 189 Wn.2d 420, 431, 403 P.3d 45 (2017). This court reviews a trial court's decision on a motion to dismiss for abuse of discretion. Id. The defendant bears the burden to show that the government action in question prejudiced their right to a fair trial. Id. "Such prejudice includes the right to a speedy trial and the

'right to be represented by counsel who has had sufficient opportunity to adequately prepare a material part of his defense.'" State v. Michielli, 132 Wn.2d 229, 240, 937 P.2d 587 (1997) (quoting State v. Price, 94 Wn.2d 810, 814, 620 P.2d 994 (1980)). "[C]ase law makes clear that a party cannot meet this burden by generally alleging prejudice to his fair trial rights—a showing of actual prejudice is required." Salgado-Mendoza, 189 Wn.2d at 431-32. This court reviews the trial court's ruling on a CrR 8.3(b) motion for an abuse of discretion. Brooks, 149 Wn. App. at 384.

The State was aware throughout the pendency of the case that identity was a key factor in the defense. Beck's 911 call identified her attacker as Ronald Ruffin. The man arrested at the scene was Ronelle Williams. Despite this fact, the record suggests that the government took no steps during the pretrial investigation phase to connect the Ruffin alias to Williams. Officers' testimony makes clear that Williams was never taken for an on-site or "show up" identification while Beck was still on scene. Neither was Beck offered a photo array to identify her assailant during her subsequent police interview or the lead up to trial. To only act to create evidence of identity after trial has commenced is highly suggestive of mismanagement by the State.

The importance of identity to the case was further reinforced during motions in limine when the parties litigated the admissibility of the booking sheet which included the Ruffin alias. The court had reserved ruling on that issue after an earlier evidentiary hearing, but took the matter up again at the request of the parties. Eventually, the court suggested "the steps that the State might have to go

- 22 -

through is to have a conviction for Mr. Williams as an a/k/a Ruffin, and then you'd have to match fingerprints for that conviction in this case." At that point, the State was granted an order to obtain Williams's fingerprints so as to present evidence of identity at trial consistent with the court's proposal.

Williams objected to the order on fingerprinting and brought a CrR 8.3(b) motion, arguing that the State knew they would need to connect Williams to the alias and that the proposed method of fingerprinting Williams and matching it to a judgment and sentence in Ruffin's name still would not be sufficient to establish a foundation for the source of the a/k/a information contained in the booking sheet. The next day, Williams's counsel advised the court of the additional investigative efforts which would be necessary to sufficiently prepare for trial if Williams was fingerprinted. The trial court had indicated that it allowed the fingerprinting to occur, at least in part, because the State "probably didn't anticipate" the court's ruling as to the need for establishing the foundation for the a/k/a information.

Fingerprinting occurred a few days later and shortly after, the defense requested discovery of the comparison report from the expert for connecting the alias to Williams's prints. The trial then recessed for nearly three weeks before the parties returned to select a jury. After resuming trial, the fingerprinting issue was renewed as the State had not utilized the fingerprints for their expressed purpose: to compare with a judgment and sentence of Ronald Ruffin. The trial court ruled that the fingerprint examiner could testify that a prior court document with Williams's fingerprints on it matched the booking prints and those taken pursuant to the court's order after trial commenced. Defense then argued that the fingerprint

evidence, as offered, was not relevant given the defendant did not dispute that he was Ronelle Williams.

The next day Williams's counsel renewed the CrR 8.3(b) motion, arguing they were now facing a dilemma of going forward in the midst of trial underprepared or continuing the case while Williams was in custody. The court denied the motion but acknowledged "the purpose of the fingerprinting has morphed somewhat." The court also rejected the alternative relief sought by the defense; recess for the defense to consult a fingerprint expert. The court based its denial, in part, on its disbelief of the defense claim that they were unable to acquire funding for their own expert until that point. The court also denied the defense request for color copies of the PowerPoint presentation on the fingerprint comparison that the State intended to use in trial.

We acknowledge the efforts of defense counsel to properly prepare for trial and consult with relevant experts. However, given that the State ultimately failed to utilize the fingerprints for its stated purpose of connecting Williams to the Ruffin alias, which would have been much more damning to the defense, we struggle to identify the strategic benefit of obtaining an expert to challenge a conclusion affirming the defendant's identity as Williams. The fingerprints were ultimately used merely to confirm something the defense did not dispute; that the man on trial was Ronelle Williams.

The prosecution mismanaged the case when it chose not to gather or prepare this identity evidence prior to trial, either through seeking an order for fingerprints or having Beck identify Williams as her attacker, especially given that

the pretrial CrR 3.6 motion focused on the very issue of identity. The problematic choice not to collect evidence of identity until trial had commenced is compounded by the fact that the State successfully petitioned the court for an order to obtain new fingerprints from Williams for one specific proffered reason, but then ultimately utilized it for a completely different purpose. Other cases have found this sort of last minute shifting, particularly in the midst of trial, to constitute governmental misconduct. See Brooks, 149 Wn. App. 373 (finding state's failure to provide numerous discovery documents until day of trial constituted government mismanagement); Salgado-Mendoza, 189 Wn.2d 420 (State's delay until the morning of trial to disclose which toxicologist from a list previously disclosed to defense would be called to testify constituted misconduct, however defendant failed to prove prejudice).

Nevertheless, the court's ruling on the motion to dismiss was not an abuse of discretion when the defense failed to establish prejudice from the fingerprinting. The necessary showing of actual prejudice by Williams is where our inquiry ends. Despite this new evidence created by the midtrial fingerprinting, the defense expressly argued that no one was disputing that the defendant was Ronelle Williams. As such, the newly created evidence that confirmed that fact does not appear to have prejudiced his ability to mount a defense.

V.     Right to a Public Trial

Williams next claims that a number of unrecorded sidebars violated his right to a public trial. Our state and federal constitutions guarantee an accused the right to a public trial. U.S. CONST. amend. VI; WASH. CONST. art I, § 22. "A public trial

is a core safeguard in our system of justice. Be it through members of the media, victims, the family or friends of a party, or passersby, the public can keep watch over the administration of justice when the courtroom is open." State v. Wise, 176 Wn.2d 1, 5-6, 288 P.3d 1113 (2012). "We have recognized that the right to a public trial serves to ensure a fair trial, to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions, to encourage witnesses to come forward, and to discourage perjury." State v. Sublett, 176 Wn.2d 58, 72, 292 P.3d 715 (2012). This court reviews claims of violation of an individual's right to public trial de novo. State v. Easterling, 157 Wn.2d 167, 173-74, 137 P.3d 825 (2006). The right to a public trial is not absolute. Wise, 176 Wn.2d at 9. "Courts have recognized that, while openness is a hallmark of our judicial process, there are other rights and considerations that must sometimes be served by limiting public access to a trial." Id. (citing Waller v. Ga., 467 U.S. 39, 45, 48, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984)).

Washington courts utilize the experience and logic test to determine whether the issue presented implicates the public trial right. State v. Smith, 181 Wn.2d 508, 515, 334 P.3d 1049 (2014). "The first part of the test, the experience prong, asks 'whether the place and process have historically been open to the press and general public.'" Sublett, 176 Wn.2d at 73 (quoting Press-Enter. Co. v. Superior Court of Cal for Riverside County, 478 U.S. 1, 8-10, 106 S. Ct. 2735, 92 L. Ed. 2d 1 (1986)). "The logic prong asks 'whether public access plays a significant positive role in the functioning of the particular process in question.'" Id. "If the answer to both is yes, the public trial right attaches and the Waller or Bone–

<u>Club</u> factors must be considered before the proceeding may be closed to the public." <u>Id.</u> (citing <u>Waller</u>, 467 U.S. at 47; <u>State v. Bone-Club</u>, 128 Wn.2d 254, 724, 906 P.2d 325 (1995)). "The experience and logic test can be helpful in that it allows the determining court to consider the actual proceeding at issue for what it is, without having to force every situation into predefined factors." <u>Id.</u>

If we determine the topic taken up at sidebar implicates a public trial right, we then utilize a three-part inquiry to determine whether a violation of the right to a public trial has occurred. <u>State v. Love</u>, 183 Wn.2d 598, 605, 354 P.3d 841 (2015). "First, we ask if the public trial right attaches to the proceeding at issue. Second, if the right attaches we ask if the courtroom was closed. And third, we ask if the closure was justified." <u>Id.</u> However, in <u>State v. Smith</u>, our supreme court held that "sidebars do not implicate the public trial right." 181 Wn.2d at 511. "Sidebars are not subject to the public trial right under the experience and logic test because they have not historically been open to the public and because allowing public access would play no positive role in the proceeding." <u>Id.</u>

Williams argues seven of thirteen sidebars were not recorded. The seven, and their context in the record, can be summarized as follows:

1. Defense counsel asked to approach after Juror 22's comments about the presumption of innocence.
2. Defense asked to approach after the first line of State's opening referenced a 2016 driver license associated with Beck. No objection was made on the record, but the State did rephrase to reference a "picture" instead of a license.
3. Defense requested a sidebar prior to playing jail calls for the jury. After the sidebar, the transcripts were distributed to the jury for illustrative purposes.
4. Defense objected based on foundation; the court had the attorneys approach. Afterwards, the State appeared to lay further foundation despite the judge overruling the objection.

5. Sidebar after both parties rested, then the jury was dismissed for the weekend.
6. Sidebar at the end of the day following O'Flaherty's testimony. Afterwards, the jury was dismissed and Exhibit 25A was admitted.
7. Sidebar prior to defense closing, after the defense objected based on prosecutorial misconduct during State's closing.

All seven sidebars identified in this assignment of error address either scheduling, evidentiary rulings, or jury selection. All three of these topics have been found proper for sidebars and do no implicate the public trial right. See Smith, 181 Wn.2d at 518 (upholding determination that evidentiary sidebars do not implicate public trial right); State v. Crowder, 196 Wn. App. 861, 867, 385 P.3d 275 (2016) (finding a sidebar proper during jury selection when all challenges and questioning were captured on the record). With regard to scheduling, we adopt the reasoning of State v. Tuggles, which found that a sidebar addressing scheduling fell under the category of ministerial proceedings which do not implicate the public trial right.[2] Williams does not meet his burden because he fails to engage in the proper analysis: the experience and logic test. Further, like the appellant in Smith, Williams does not offer any evidence to indicate that the public has traditionally participated in sidebars, nor what positive function the public would play by such participation.

VI. Prosecutorial Misconduct in Closing Argument

"A defendant claiming prosecutorial misconduct 'bears the burden of establishing the impropriety of the prosecuting attorney's comments and their

---

[2] State v. Tuggles, No. 45236-7-II, slip op. at 4 (Wash. Ct. App. Feb. 3, 2015), (unpublished) https://www.courts.wa.gov/opinions/pdf/D2%2045236-7-II%20Unpublished%20Opinion.pdf; See GR 14(1)

prejudicial effect.'" State v. McKenzie, 157 Wn.2d 44, 52, 134 P.3d 221 (2006) (quoting State v. Brown, 132 Wn.2d 529, 561, 940 P.2d 546 (1997)). Williams objection to the statements in closing preserved the error for appeal and he must now demonstrate prejudice; he holds the burden to prove that there exists a substantial likelihood that the misconduct affected the jury's verdict. Id. In our review we do not consider the prosecutors' allegedly improper comments in isolation, but "in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury." Brown, 132 Wn.2d at 561.

"[A] prosecutor engages in misconduct when making an argument that appeals to jurors' fear and repudiation of criminal groups or invokes racial, ethnic, or religious prejudice as a reason to convict." State v. Perez-Mejia, 134 Wn. App. 907, 916, 143 P.3d 838 (2006). "[I]nflammatory remarks, incitements to vengeance, exhortations to join a war against crime or drugs, or appeals to prejudice or patriotism are forbidden." Id. "References to evidence outside of the record and bald appeals to passion and prejudice constitute misconduct." State v. Fisher, 165 Wn.2d 727, 747, 202 P.3d 937 (2009). "Justice can be secured only when a conviction is based on specific evidence in an individual case and not on rhetoric." State v. Loughbom, No. 97443-8, slip op. at 5 (Wash. Aug. 20, 2020), http://www.courts.wa.gov/opinions/pdf/974438.pdf.

The focus of the Williams's argument is captured in the following passage from the State's closing:

> [PROSECUTOR]: Now finally, probably the biggest question you'll
> have is where is [Beck]? Why didn't she testify? I'll remind you again

of our implicit bias discussion during voir dire. You may have thought prior to this case that you would have to hear from her to find the defendant guilty. That isn't true. The jury instructions say the same. The State has proved this case beyond a reasonable doubt without [Beck].

The defendant counted on her not being here, and he told her not to be here. Abusers often rely on the flawed theory of no face, no case. If I can keep her off the stand, I'll walk out of here. That's not the case. In fact, it's quite the opposite.

[Beck] didn't show up, and that could be for a variety of reasons. We talked about the reasons that a victim might not want to testify against her abuser at trial. Could be self-preservation.

You saw how mad Ronelle Williams got when [Beck's] daughter's father came over for a custody exchange. Can you imagine how upset the defendant would be if the victim participated in the trial that convicted him?

We also talked about that idea that it's hard to do. [Beck] coming in here and sharing the lowest moment of her life with you, 14 strangers, is extremely difficult. Sometimes that's emotionally impossible. The law doesn't hold that against them.

And finally, it's what the defendant wanted. It's what he told her to do. You got to hear that on the jail calls, that power and control and he has over her, how disrespectful it was that another man would dare be outside of his house.

[DEFENSE COUNSEL]: Objection Prosecutorial misconduct.

COURT: Overruled. You may proceed.

[PROSECUTOR]: He told her not to be here. But the good news for [Beck] is that she doesn't have to come to the court for the State to prove its case. She doesn't have to walk through those doors to make sure that Mr. Williams is held accountable for what he did to her. You have ample evidence to hold him accountable, and that's what I'm asking you to do. Thank you.

Williams argues the statements as to the possible reasons for Beck's absence from trial were improper. In particular, Williams focuses on the State's claim of Beck's purported fear of Williams and the "power and control . . . he has over her." Williams also asserts the prosecutor inappropriately invited speculation as to why Beck was not there.

Trial courts are provided discretion in denying a motion for mistrial based on prosecutorial misconduct. State v. Russell, 125 Wn.2d 24, 85, 882 P.2d 747 (1994). We will not overturn a denial of such a motion, unless there is a substantial likelihood the prejudice affected the jury's verdict. Id. "The prosecutor has wide latitude in closing argument to draw reasonable inferences from the evidence and to express such inferences to the jury." State v. Stenson, 132 Wn.2d 668, 727, 940 P.2d 1239 (1997).

The evidence adduced at trial was sufficient for the reasonable inferences expressed in the prosecutor's comments on possible reasons for Beck's absence from trial. The State had presented a jail phone call as evidence in support of a witness tampering charge. In light of the recorded jail call between Williams and Beck, along with the testimony that Williams held a firearm to Beck's stomach and threatened to kill her unborn child, there was a reasonable inference from which to argue that Beck may have been fearful to testify. The trial court did not abuse its discretion in denying William's prosecutorial misconduct objection in closing.

VII.    Alternative Means of Witness Tampering

Williams concedes that there was sufficient evidence as to one of the alternative means of committing witness tampering, but avers that it was insufficient as to the two other means. Jury unanimity is not required as to each means by which a defendant commits a crime with alternative means if sufficient evidence supports each alternative means charged. State v. Owens, 180 Wn.2d 90, 95-99, 323 P.3d 1030 (2014). "Evidence is sufficient if, viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the

essential elements of the crime beyond a reasonable doubt." Id. at 99. Tampering with a witness provides for three alternatives means (all of which were charged here). RCW 9A.72.120 provides:

> (1) A person is guilty of tampering with a witness if he or she attempts to induce a witness or person he or she has reason to believe is about to be called as a witness in any official proceeding or a person whom he or she has reason to believe may have information relevant to a criminal investigation or the abuse or neglect of a minor child to:
>   (a) Testify falsely or, without right or privilege to do so, to withhold any testimony; or
>   (b) Absent himself or herself from such proceedings; or
>   (c) Withhold from a law enforcement agency information which he or she has relevant to a criminal investigation or the abuse or neglect of a minor child to the agency.

Williams concedes that there was sufficient evidence as to the (c) prong, and limits his argument to (a) and (b). Neither party disputes the contents of the exhibit labelled "jail phone call 19"; it is a recording of an outgoing call from Williams to a woman who then connects her call to another woman. The second woman is never identified in the call, but the prosecutor suggested it was Beck and we will so assume for purposes of our analysis here. Williams makes statements to the second woman, saying that she needs to talk if contacted, but talk and then stop. Williams reinforces again, participate and then stop. Williams makes a statement to the effect that the State could "pick it up"[3] and if she participates with the court and then "boom," he would get off. The call ends with Williams reinforcing: "do what you gotta do for me."

Viewing the above statements by Williams in the light most favorable to the State, his vague comments support the two alternative means he challenges. As

---

[3] The inference at trial was that "it" refers to the criminal case against Williams.

to the first, (a), attempt to induce a potential witness to "[t]estify falsely or, without right or privilege to do so, to withhold any testimony," the directive to Beck is to withhold testimony by talking, but then stopping. The evidence would support the inference that Williams wanted Beck to cooperate and talk with police, but then not say too much, perhaps without testimony. Another interpretation that would be supported is that Williams wanted Beck to talk and cooperate with law enforcement during the investigation and then disappear, thereby withholding testimony during trial.

For these same reasons it appears (b), "Absent himself or herself from such proceedings," is also supported because the "stop" statement from the calls could be a directive to not show up to interviews or trial. It is noteworthy that the record makes clear that Beck was reluctant to work with anyone involved in the case as far as scheduling interviews or service of a subpoena, and she did not appear at trial. The "talk . . . and then stop" statement, along with the comment about the State picking up the case and then "boom, that's the only way [he would] get off," implies that Beck should work with the prosecution and then not show up to trial. The all three alternative means of witness tampering were adequately supported by evidence based on jail call 19.

VIII.    Cumulative Error

Finally, Williams asserts that cumulative error should result in remand for retrial. "The accumulation of errors may deny the defendant a fair trial and therefore warrant reversal even where each error standing alone would not." State v. Davis, 175 Wn.2d 287, 345, 290 P.3d 43 (2012), abrogated on other grounds

by State v. Gregory, 192 Wn.2d 1, 427 P.3d 621 (2018). However, when there is overwhelming evidence of the defendant's guilt, cumulative errors do not require reversal. In re Pers. Restraint of Cross, 180 Wn.2d 664, 691, 327 P.3d 660 (2014), abrogated on other grounds by Gregory, 192 Wn.2d 1 (2018). A defendant has the right to a fair trial, not a perfect one. In re Pers. Restraint of Elmore, 162 Wn.2d 236, 267, 172 P.3d 335 (2007). Because we do not find multiple errors by the trial court, we do not reach William's cumulative error argument.

IX.     Statement of Additional Grounds

A defendant may provide a pro se statement of additional grounds (SAG) for review. RAP 10.10. "Although reference to the record and citation to authorities are not necessary or required, the appellate court will not consider an appellant's SAG if it does not inform the court of the nature and occurrence of alleged errors." State v. Gauthier, 189 Wn. App. 30, 43-44, 354 P.3d 900 (2015). Williams presents three additional bases for review relating to jury instructions, sufficiency of the evidence as to one of the crimes of conviction, and calculation of his offender score.

A.  Ineffective Assistance of Counsel

Williams avers that his trial counsel was ineffective for failing to propose a jury instruction that contained the proper definition of "armed." Based on the argument as framed in the SAG and review of the trial transcript, we assume this challenge is intended to address counsel's failure to object to the instruction as given, without the definition of "armed."

The accused has a right to assistance of counsel under both the federal and state constitutions. U.S. CONST. amend. VI; WASH. CONST. art. 1, § 22. "A claim that counsel was ineffective is a mixed question of law and fact that we review de novo." State v. Jones, 183 Wn.2d 327, 338, 352 P.3d 776 (2015). To prevail on a claim of ineffective assistance, counsel's performance must have been deficient, and the deficient performance must have resulted in prejudice. State v. Grier, 171 Wn.2d 17, 32-33, 246 P.3d 1260 (2011); Strickland v. Wash., 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). "The threshold for the deficient performance prong is high, given the deference afforded to decisions of defense counsel in the course of representation." Grier, 171 Wn.2d at 33. Performance is deficient if it falls "below an objective standard of reasonableness based on consideration of all the circumstances." State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). The reviewing court engages in a strong presumption that counsel was effective. Id. at 335.

Williams challenges instruction #34, which is based on Washington Pattern Instruction 2.07. He argues that the bracketed information in the pattern instruction which defined "armed" should have been given and that his counsel was deficient for failing to propose it or, alternatively, failing to object to the instruction as offered without the definition. This argument is without merit. The instruction includes the following comment on use: "[d]o not use the second paragraph in a case in which the weapon was actually used and displayed during the commission of the crime." WPIC 2.07. The second paragraph referenced in the comment is the definition portion Williams believes should have been given. The evidence at trial was that

Beck claimed her assailant brandished the weapon during the commission of the crimes alleged. It was not deficient performance for defense counsel to fail to object to instruction #34 as given, without the paragraph defining "armed," nor to fail to explicitly propose the instruction with the definition, since the Note on Use for the instruction expressly indicates that this language would not be proper under these facts.[4]

B. Sufficiency of the Evidence as to Unlawful Possession of Firearm in the First Degree

Williams argues there was no direct or circumstantial evidence to prove constructive possession of the firearm which was recovered in Beck's apartment. "In reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State to determine whether a rational trier of fact could find the elements of the offense beyond a reasonable doubt." State v. Alvarez, 105 Wn. App. 215, 220, 19 P.3d 485 (2001). Williams's argument improperly focuses on constructive possession. He emphasizes an apparent lack of evidence as to whether the apartment where this incident occurred was his residence, such that he could be deemed to have constructive possession over the firearm recovered from inside the apartment.

It is clear from the record that Williams was convicted for actual possession of the firearm. The jury appears to have found Beck's claims in the 911 call

_____

[4] Williams appears to intend to argue error as to another jury instruction, #35, which he attaches in his SAG. However, he provides no argument or context for the attachment . . . the text associated with that issue appears to be a duplicate of his argument as to instruction #34. As such, there is insufficient argument to reach this issue.

- 36 -

credible, such that they convicted on the assault in the second degree and harassment counts, both with firearm enhancements. It is reasonable to conclude, then, that the jury believed that the man she accused of assaulting her held a gun to her, thus actually possessing the firearm in that moment. The evidence adduced at trial, instructions given and argument by the State all go to actual possession of the firearm, not constructive.

### C. Miscalculation of Offender Score/Same Criminal Conduct

Williams's final argument is that all the counts for which he was convicted constitute the same criminal conduct under RCW 9.94A.589(1)(a). This court reviews the trial court's determination of same criminal conduct for abuse of discretion or misapplication of the law. State v. Tili, 139 Wn.2d 107, 122, 985 P.2d 365 (1999). For the purpose of calculating an offender score, when the court finds that multiple offenses in the current case encompass the same criminal conduct, those offenses are counted as a single crime. RCW 9.94A.589(1)(a). The statute defines "same criminal conduct" to mean "two or more crimes that require the same criminal intent, are committed at the same time and place, and involve the same victim." Id. The sentences imposed for crimes that encompass the same criminal conduct are to run concurrently. Id. The defendant bears the burden to establish each element of same criminal conduct under RCW 9.94A.589(1)(a). State v. Graciano, 176 Wn.2d 531, 540-41, 295 P.3d 219 (2013). Here, Williams does not engage in the statutory analysis and provides no argument beyond a conclusory statement that all the counts were the same criminal conduct, therefore he has

failed to meet his burden to demonstrate abuse of discretion or misapplication of the law.

Affirmed.

WE CONCUR: